TRAILWAYS, INC. and Transportes Del Norte, Appellants,

v.

Anita CLARK, Individually and as Personal Representative of the Estate of Eulalia P. Mayorga, et al., Appellees.

No. 13–87–227–CV.

Court of Appeals of Texas, Corpus Christi.

June 22, 1990.

Rehearing Overruled Aug. 31, 1990.

Jeffrey W. Jones, Johnson & Davis, Harlingen, Reynaldo G. Garza, Garza & Garza, Brownsville, Thomas Black, San Antonio, Thomas Hight, Hight & Hight, Dallas, for appellants.

Ann Skaro, Frank Delaney, Corpus Christi, Frank M. Skaggs, Jamail & Kolius, Houston, for appellees.

Before NYE, C.J., and KENNEDY and SEERDEN, JJ.

## OPINION

KENNEDY, Justice.

This is a wrongful death case on remand from the Supreme Court of Texas 774 S.W.2d 644. The decedents, Eulalia Mayorga and Emma Trejo, while traveling on a bus in Mexico, were killed when the bus left the highway and overturned. Their survivors and the representatives of their estates brought the present suit to recover wrongful death and survival damages from Transportes Del Norte (TDN), the Mexican bus line on which the decedents were traveling, as well as from Trailways, Inc. (Trailways), a bus line operating out of Texas which plaintiffs also sought to hold responsible for the deaths. The jury found TDN negligent and assessed the amount of damages resulting to each plaintiff from the wrongful deaths. The trial court awarded judgment for plaintiffs against both TDN and Trailways, based on its own findings that Trailways was also liable for the damages resulting from TDN's negligence. In the present appeal, TDN brings six points of error, Trailways brings ten, and appellees bring four cross-points.

TDN's first point of error was originally sustained by this Court and the case remanded thereon. However, the Texas Supreme Court reversed our disposition of the case, overruling the first point and remanding the case to our Court to address the remaining points of error. Having examined TDN's remaining points, followed by Trailways' points, and finally, appellees' cross-points, we have determined that the judgment of the trial court holding Trailways liable should be reversed and judgment here rendered that appellees take nothing against Trailways, with the remainder of the judgment affirmed.

■■■ By its third point of error, TDN complains that the trial court erred in allowing Officer Hector Morales to testify as an expert on the cause of the accident and the speed of the bus. TDN challenges Morales' qualification to testify as an expert to these matters.

Hector Morales testified that he is presently a supervisor for the Mexican Federal Police and that he has been with the federal police continuously in various capacities since the time of the accident. He testified that he has a junior high school education and a year and a half of vocational school. In order to get into the federal police, he took a course which consisted of, among other things, Mexican traffic rules, driving skills and traffic accidents. In addition, he has taken several up-date courses covering traffic accidents and a twelve-day engineering course giving him some knowledge of engineering as it relates to accidents. In these various courses, Morales has been taught to determine the speed of a vehicle by the length of its skid marks, taking into account the vehicle, the road, and the driver.

At the time of the accident in October 1979, Morales was the officer in charge of vigilance, and his duties included patrolling the highway and going to the scene of accidents within his assigned area between Queretaro and Mexico City. He was on duty in the early morning of October 4th when the accident in question was reported to him over his radio and he rushed to the scene. The accident occurred on, or just beyond, a 90 degree curve in the road, approximately halfway between Queretaro and Mexico City. Morales testified that he has traveled that highway many times and is familiar with this curve. The road is a four lane divided highway, most of which has a posted speed limit of 100 kilometers per hour (kph) because it has very few curves. On the curves, however, the speed limit is reduced to 80 kph. Morales testified that the speed limit in Mexico is 80 kph when not otherwise posted, and that, therefore, the speed limit on the curve where the accident occurred was 80 kph.

When Morales arrived at around 7:30 a.m., he observed two tire tracks leading off the highway from the inside lane to the right edge, and the bus overturned in a ravine some 25 meters beyond the highway. Morales measured these tracks at 50 meters by pacing them off. In addition, he observed that the right suspension bar of the bus had broken off. Morales testified that he believed the broken right suspension must have caused the bus to go out of

control and contributed to the accident but that speed was also a factor in the accident. Using tables given to him at a course he took with the highway patrol and accepted in Mexico by the engineers from the ministry of communication, Morales testified that the 50 meters of tracks on the highway reflect that the bus was traveling at least 102 kph before the driver lost control. In addition, after leaving the highway the bus continued to travel some 10 meters over flat ground before turning over one and a half times. Morales concluded that the bus could not have safely exceeded 90 kph on the curve and that, if the bus had been going the 90 kph or the speed limit, it would have been able to stop before the turnover which caused the deaths of the decedents.

A witness who, by his knowledge, skill, experience, training, or education, has specialized knowledge that will assist the trier of fact to understand the evidence or determine a fact in issue may express an opinion about the matter. *DeLeon v. Louder*, 743 S.W.2d 357, 359 (Tex.App.—Amarillo 1987), *writ denied*, 754 S.W.2d 148 (Tex.1988); Tex.R.Civ.Evid. 702. Specifically, accident analysts and reconstruction experts may testify if the party offering their testimony shows that they are trained in the science of which they testify. *Rogers v. Gonzales*, 654 S.W.2d 509, 512 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.); *Clark v. Cotten*, 573 S.W.2d 886, 887 (Tex.Civ.App.—Beaumont 1978, writ ref'd n.r.e.). There are, however, no definite guidelines for determining the knowledge, skill or experience required of a particular witness to testify as an expert, which is within the trial court's discretion to determine, and the court's determination will not be disturbed absent a clear abuse of that discretion. *DeLeon*, 743 S.W.2d at 359; *Rogers*, 654 S.W.2d at 513.

TDN specifically points to a law review note cited in *Clark*, 573 S.W.2d at 887, that stated as a general proposition:

'As for regular police officers, sheriffs, mechanics, etc., it generally may be said that they lack such training and experience as would qualify them to make a scientific analysis from physical evidence, regardless of how many accident scenes one may have examined.' Note, *Opinion Testimony of Expert 'Accident Analyst' Reconstructing Collision Admissible*, 38 Tex.L.Rev. 503, 506 n. 14 (1960).

Nevertheless, even if some of the more technical aspects of accident reconstruction are generally outside the competence of most law enforcement officers, our own Court has stated that an investigating officer, once shown to be qualified, may properly base an estimate of speed upon skid marks. *Rogers*, 654 S.W.2d at 514; *see also Adams v. Smith*, 479 S.W.2d 390, 395 (Tex.Civ.App.—Amarillo 1972, no writ). It has thus repeatedly been held to be within the trial court's discretion to allow a law enforcement officer to testify as an expert, based on police training schools and experience in prior accident investigations, regarding the speed of a vehicle based on the skid marks left at the scene of an accident. *See Rogers; Bates v. Barclay*, 484 S.W.2d 955 (Tex.Civ.App.—Beaumont 1972, writ ref'd n.r.e.); *Adams; Beynon v. Cutberth*, 390 S.W.2d 352 (Tex.Civ.App.—Eastland 1965, no writ).

In the present case, Officer Morales adequately related his police training and the tables he had been taught to use in determining the speed of a vehicle from its skid marks. We hold that it was within the trial court's discretion to allow Morales to testify as a expert regarding the speed of the bus and its contribution to the cause of the accident. TDN's third point of error is overruled.

■ By its fourth and fifth points of error, TDN challenges the legal sufficiency of the evidence to support the jury's findings that TDN failed to keep such a lookout as a person using a high degree of care would have kept, and that it was driving at a greater rate of speed than a person using a high degree of care would have driven.

In considering a "no evidence," "insufficient evidence" or "against the great weight and preponderance of the evidence" point of error, we will follow the well-established test set forth in *Pool v. Ford Motor*

*Co.,* 715 S.W.2d 629 (Tex.1986); *Dyson v. Olin Corp.,* 692 S.W.2d 456 (Tex.1985); *Glover v. Texas General Indemnity Co.,* 619 S.W.2d 400 (Tex.1981); *Garza v. Alviar,* 395 S.W.2d 821 (Tex.1965); *Allied Finance Co. v. Garza,* 626 S.W.2d 120 (Tex. App.—Corpus Christi 1981, writ ref'd n.r. e.); and Calvert, *No Evidence and Insufficient Evidence Points of Error,* 38 Texas L.Rev. 361 (1960).

In the present case, the testimony of Officer Morales that, based on his knowledge of the road and his analysis of the skid marks and the accident scene, the bus was going over 100 kph in an area where the speed limit was 80 kph and that it would not have been safe to exceed 90 kph, we find that there is some evidence to support the jury's finding that TDN's driver exceeded the rate of speed at which a person using a high degree of care would have driven.

Because there is legally sufficient evidence to support the judgment based on the jury's finding of excessive speed, we need not examine whether there is sufficient evidence also to show failure to keep a proper look-out. Appellant TDN's fourth and fifth points of error are overruled.

■ By its second point of error, TDN complains that the trial court erred in applying Texas law, as opposed to Mexican law, to the issues of wrongful death damages and indemnity.

From the record, it appears that TDN properly put the trial court, Clark and Trailways on notice of its intent to rely on Mexican law to determine the amount of damages, by filing more than 30 days prior to trial a letter from a Mexican attorney explaining the provisions of Mexican law relating to wrongful death damages, together with copies of the Mexican law and certified translations. *See Ossorio v. Leon,* 705 S.W.2d 219 (Tex.App.—San Antonio 1985, no writ); Tex.R.Civ.P. 184a; Tex.R.Civ.Evid. 203. However, it appears that TDN neither placed Mexico's law of indemnity before the trial court nor argues the issue in its brief. Therefore, the trial court correctly assumed that Mexico's law, if applicable at all, was the same as the

Texas law of indemnity, and appellant has waived any right to rely on the Mexican law of indemnity against Trailways. *See Franklin v. Smalldridge,* 616 S.W.2d 655, 657 (Tex.Civ.App.—Corpus Christi 1981, no writ).

We will now discuss whether it was proper for the trial court to apply Texas law to the calculation of wrongful death damages. In *Gutierrez v. Collins,* 583 S.W.2d 312 (Tex.1979), the Texas Supreme Court discarded the traditional *lex loci delicti,* or place of the wrong, approach to resolving conflicts of law in tort actions and adopted the "most significant relationship" test of sections 6 and 145 of the Restatement (Second) of Conflict of Laws (1971). In *Total Oilfield Services, Inc. v. Garcia,* 711 S.W.2d 237 (Tex.1986), the Restatement test adopted by *Gutierrez* was specifically applied to conflicts involving wrongful deaths occurring outside Texas.

Section 6 of the Restatement provides broad general guidelines for deciding any conflicts question based on the relative interests of the states involved:

§ 6. Choice-of-Law Principles

(1) A Court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Section 145 applies these guidelines specifically to tort actions:

§ 145. The General Principle

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Finally, though not mentioned in *Gutierrez* or *Garcia,* section 175 of the Restatement (Second) of Conflict of Laws provides:

§ 175. Right of Action for Death

In an action for wrongful death, the local law of the state where the injury occurred determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

In *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 421 (Tex.1984), the Court stated that the beginning point in conflicts analysis is the identification of the policies or governmental interests, if any, of each state in the application of its law.

■ In the simplest case, when the only identifiable competing state interests are that the plaintiffs are residents of one state and the defendants are residents of another, and no other factors would make the interests of one state any more significant than those of the other, wrongful death damages will generally be determined according to the law of the place of injury. *See Harris v. Polskie Linie Lotnicze,* 820

F.2d 1000, 1003–04 (9th Cir.1987); *Butler v. United States,* 726 F.2d 1057, 1066 (5th Cir.1984); Restatement (Second) of Conflict of Laws § 175.

However, when additional considerations favor one state or the other, the place of injury is no longer the controlling factor. The next task is to determine the relative significance of the states' interests to the particular case and issues. Moreover, in *Gutierrez,* 583 S.W.2d at 319, the Court emphasized that the application of the "most significant relationship" analysis should not turn on the number of contacts any state has to the case but more importantly should turn on the qualitative nature of those contacts. There is no set formula for determining the significance of any particular contact, which must generally be weighed on a case-by-case basis and balanced against other such contacts. The trial judge, therefore, should have some latitude in balancing legitimate competing state interests. *See Gutierrez,* 583 S.W.2d at 319.

■ In the present case, the decedents and their survivors, plaintiffs in the present wrongful death suit, are Texas residents. The present controversy began when decedents bought round trip bus tickets to Mexico City from a subsidiary of Trailways in Corpus Christi, Texas. Trailways, which does not provide bus service in Mexico, had what is termed an "interlining" agreement with certain Mexican bus lines, including TDN, whereby Trailways would issue tickets to destinations in Mexico and TDN would honor the Trailways tickets from the border to the passenger's destination in Mexico and would then reclaim from Trailways the price of the ticket for the Mexican portion of the journey, less a 12% commission for Trailways. In turn, TDN had similar rights under the agreement to sell tickets to destinations in the United States which Trailways would honor.

The decedents boarded a Trailways bus in Corpus Christi and traveled to Brownsville, Texas, where they boarded a TDN bus and continued their journey across the

border and chose to "interline" with TDN to Mexico City. The accident causing their deaths occurred in Mexico as an alleged result of TDN's negligent operation of the bus on which the decedents were traveling.

In wrongful death cases, Texas has an interest in protecting the rights of its citizens to recover adequate compensation for the wrongful death of their relatives in foreign lands. Mexico has a competing interest in protecting its residents from what it may consider to be excessive liability to foreigners for actions occurring on Mexican soil. Were these the only interests involved in the present case, we would be compelled to hold that neither Texas nor Mexico had a more significant interest and that the law of Mexico as the place of the injury applies. *See Harris,* 820 F.2d at 1003–04; *Butler,* 726 F.2d at 1066; Restatement (Second) of Conflict of Laws § 175.

However, the relationship between the decedents and TDN began in Corpus Christi, Texas, at the time they purchased bus tickets granting them the option of traveling on TDN from the Texas border to Mexico City. The initial negotiation and agreements leading to an entrustment by Texas residents of their safety to the foreign national occurred on Texas soil. This negotiation centered, or at least initiated, the relationship between decedents and TDN in Texas, which has at least as much significance to the overall duty to compensate the survivors as the actual place of the negligence or death. When a foreign corporation, by itself or through its agents, solicits business in Texas with Texas residents, as TDN did in effect through the interlining agreement, Texas has an interest in compelling the foreign corporation to pay adequate compensation for injuries to those residents, even if they occur in the foreign state or country.

In *Wall v. Noble,* 705 S.W.2d 727, 733 (Tex.App.—Texarkana 1986, writ ref'd n.r. e.), the Court upheld the application of Texas medical malpractice law when a Louisiana surgeon was first approached by the Texas plaintiff through the surgeon's Texas office, and the only contact that the plaintiff had with Louisiana was performance of the surgery there. Even though Louisiana was the place of injury, the Court found that Texas had the more significant interest based in part on the fact that the relationship between the parties began and ended in the Texas office.

In addition, the widespread adoption of the Restatement's "most significant contacts" test leads us to give some weight to out-of-state cases. In *Kinnett v. Sky's West Parachute Center, Inc.,* 596 F.Supp. 1039 (D.Colo.1984), the decedent, a resident of Wyoming, purchased in Wyoming from an airline doing business there a round trip ticket to Dallas, Texas. The airplane on which the decedent was flying on his return trip collided with another plane and crashed in Colorado. The decedent's relatives, all residents of Wyoming, brought a wrongful death action in Colorado against the airline on which the decedent was flying and the corporation which owned the other plane with which it collided, both of which were Colorado corporations. Although they brought the action in Colorado, plaintiffs moved the court to apply Wyoming's wrongful death statute to determine damages. In determining that Wyoming had a more significant relationship than Colorado, the federal court in Colorado placed little weight on the fact that the injury occurred in Colorado, but it put great emphasis on the fact that the decedent purchased his ticket in Wyoming from a corporation doing business there, for a trip that would begin and end in Wyoming. The Court further noted that there is no injustice in requiring out-of-state corporations conducting business in Wyoming to be responsible according to Wyoming's laws for the deaths of Wyoming residents while they are being transported on round trips beginning and ending in the Wyoming.

Similarly, in the present case, we hold that there was no injustice in requiring TDN to be responsible according to Texas law for the death of passengers who bought round trip tickets to Mexico City in Corpus Christi and that the trial court did not err in weighing Texas' contacts as the

most significant. TDN's second point of error is overruled.

By TDN's sixth point of error and Trailways' tenth, both appellants argue that the trial court erred in admitting post-death pictures of the decedents' bodies and testimony concerning their treatment and handling. There was extensive testimony by Linda Ramirez and Cynthia Cortez, daughters of Trejo, and Gloria Trevino, daughter of Mayorga, about the condition of the bodies and how they had been treated after the accident.

Ramirez testified without objection that her mother's body was leaking fluid from its casket and that the only time she saw her mother after the accident was in a post-death picture printed in a Mexican magazine. At this point, appellees offered post-death magazine pictures of the bodies, and appellants objected on the grounds that they were irrelevant, immaterial, and inflammatory. The objections were overruled and the pictures admitted.

Cortez testified without objection that her mother had asked her to put booties on her feet after she died to keep them from getting cold, but she was not able to because the casket couldn't be opened because of the horrible smell, and all she could do was hug it. Cortez also stated that her mother was not embalmed. In response to the question whether she was bothered by any thoughts concerning her mother's body, Cortez further testified that she was bothered that her mother was set out by the side of the road after the accident, put on a slab for four days without refrigeration, allowed to decompose, and buried by the side of the road. Trailways objected to Cortez' last statements as inflammatory and irrelevant. The trial court, without ruling on the objection, admonished the witness to stick to the questions asked. Trailways made no further objection or motion to strike.

Gloria Trevino testified without objection that her mother's body was first buried in a field beside the road in a common grave and that the body had not been embalmed. Trevino made arrangements with a Mexican funeral director to exhume the bodies and fly them to Corpus Christi. Trevino further testified that the bodies were put in coffins on a Thursday, taken to the airport on Friday morning, and left outside with the freight until Saturday when they flew out. She also stated that the coffins were leaking body fluids and that the crates in which the coffins were contained took 11 people to carry them. When asked about her experience in going over to the crates, Trevino then testified that her children wanted to walk over to the coffin, but Trailways cut off the remainder of her answer by an objection on the grounds of relevance and inflammatory nature, which was overruled by the court. Trevino then testified that she and her children could smell the body and that they got the body fluids on their hands. Trevino then testified that she later saw a magazine picture of her mother with her face split open. Appellees tendered the picture into evidence, and appellants objected on ground of relevance. The trial court overruled the objection and admitted the picture into evidence. Trevino then testified that she was angry that the picture had been published and that whoever had her mother's purse could have easily found her identification and called Trevino to have her mother picked up before she was buried in Mexico. TDN moved to strike this testimony on the ground that it assumed matters not in evidence. The trial court overruled the objection.

██ In order to preserve the right to complain on appeal about the admission of evidence, a party must have objected at the time the evidence was offered, the objection must have been specific enough to enable the trial court to understand the precise nature of the error alleged, and the party must have obtained a ruling on the objection. *Guzman v. Solis*, 748 S.W.2d 108, 111 (Tex.App.—San Antonio 1988, writ denied); *MBank·Dallas N.A. v. Sunbelt Mfg., Inc.*, 710 S.W.2d 633, 638 (Tex.App.—Dallas 1986, writ ref'd n.r.e.); *Duke v. Power Elec. and Hardware Co.*, 674 S.W.2d 400, 405 (Tex.App.—Corpus Christi 1984, no writ); *Irrigation Constr. Co. v. Motheral Contractor, Inc.*, 599 S.W.2d

336, 342 (Tex.Civ.App.—Corpus Christi 1980, no writ). Although appellants made sporadic objections, the majority of the daughters' testimony concerning the condition and handling of their mothers' bodies was unobjected to, and error has thus been waived.

■ The objections that were made, moreover, failed to preserve error. Specifically, Trailways' objection to Cortez' numerous statements concerning the mistreatment of Trejo's body was never ruled on and thus did not preserve error. *See Duke,* 674 S.W.2d at 405. Appellants' objection to Trevino's answer about her experiences when she approached the coffin was premature, since there was no indication in the record about what those experiences would be, and appellants failed to further object when the answer did in fact reveal matters of a prejudicial nature concerning the condition of the body. *See Farm Services, Inc. v. Gonzales,* 756 S.W.2d 747, 750 (Tex.App.—Corpus Christi 1988, writ denied). Finally, TDN's objection to Trevino's testimony concerning identification of the body and ability to contact the relatives was not based on relevance or prejudicial effect and thus could not preserve error on these grounds. *Guzman,* 748 S.W.2d at 111; *MBank,* 710 S.W.2d at 638.

■ With regard to the post-death pictures of the decedents, although there were specific objections on the grounds of relevance and prejudice, the daughters, without objection, graphically described certain elements of the condition of the bodies before and after the pictures were introduced. Even though an objection to evidence is properly made, prior or subsequent presentation of essentially the same evidence without objection waives error. *See Missouri Pacific R.R. Co. v. Huebner,* 704 S.W.2d 353, 357–58 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.); *In re Dahl,* 590 S.W.2d 191, 199 (Tex.Civ.App.—Amarillo 1979, writ ref'd n.r.e.).

■ However, even if appellants' point had been preserved, the pictures were nevertheless relevant and admissible as evidence of the decedents' physical pain and suffering before death, which is compensable to the decedents' estate as a survival cause of action and was pleaded and recovered in the present case. *See Tarrant County Hosp. Dist. v. Jones,* 664 S.W.2d 191, 195 (Tex.App.—Fort Worth 1984, no writ). The pictures show extensive physical injuries which are relevant to the amount of pain and suffering that decedents experienced from the violence of the accident and the seriousness of their injuries immediately before death. We overrule TDN's sixth and Trailways' tenth points of error.

The nine remaining points of error are brought solely by appellant Trailways. By its first point of error, Trailways complains that there was no evidence, pleadings or findings to support disregarding the corporate separateness of Trailways from its wholly-owned subsidiaries, Trailways Bus Systems, Inc., (TBS) and Trailways Texas, Inc. (Trailways Texas).

The evidence is undisputed that decedents purchased their tickets from TBS at a TBS bus station and that Trailways Texas operated the buses from Corpus Christi to Brownsville and the bus station in Brownsville from which decedents transferred to a TDN bus. Although the jury verdict found only that TDN had negligently caused the accident, the trial court extended liability to Trailways based on the court's own findings that Trailways was an agent for the undisclosed principal TDN and that Trailways breached its implied contract for safe passage during decedents' travel in Mexico. The critical act that appellees relied upon to extend liability to Trailways under both theories was the sale of the tickets by TBS at the decedents' point of departure in Corpus Christi, Texas. If the contract for passage can be viewed as an act of Trailways itself, as well as of its subsidiary, then liability may be extended.

■ Appellees seek to characterize Trailways' contentions here as an argument that it had been sued by the wrong name or in the wrong capacity. We note initially that when a plaintiff's cause of

action should have been brought against a separate and distinct corporate entity other than the one sued, there is no misnomer. Rather, there is a mistake in identity, and the wrong party is under no obligation to correct that mistake. *See Braselton–Watson Builders, Inc. v. Burgess*, 567 S.W.2d 24, 27 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.); *Barnes v. Continental Trailways, Inc.*, 472 S.W.2d 606, 607 (Tex. Civ.App.—Eastland 1971, no writ); *Cosand v. Gray Wolf Co.*, 262 S.W.2d 547 (Tex.Civ. App.—Galveston 1953, no writ).

■ On the other hand, if Trailways was complaining that it had been sued in the wrong capacity, it would have had to raise that defense in a verified pleading in accordance with Tex.R.Civ.P. 93. *See Van Voorhies v. Hudson*, 683 S.W.2d 809, 810 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.); *Sunbelt Constr. Corp. v. S & D Mechanical Contractors, Inc.*, 668 S.W.2d 415, 418 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.); *Butler v. Joseph's Wine Shop, Inc.*, 633 S.W.2d 926, 929 (Tex. App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.).

■ However, as Trailways points out, the problem is not one of failure to sue under the correct name or in the correct capacity but one of failure to sue the correct party. Appellees brought suit against Trailways alone as the party directly liable under the above theories. Their pleadings neither mentioned TBS or Trailways Texas nor did they allege alter ego or any other type of derivative liability between Trailways and its subsidiaries. Where, as here, the defendant is sued in its individual capacity and not in an alter ego or derivative capacity, capacity to sue is not placed in issue so as to give rise to a duty on the part of the defendant to deny such capacity under Tex.R.Civ.P. 93. *See Light v. Wilson*, 663 S.W.2d 813, 814 (Tex.1983); *John Chezik Buick Co. v. Friendly Chevrolet Co.*, 749 S.W.2d 591, 593 (Tex.App.—Dallas 1988, writ denied); *Miles v. Plumbing Serv. of Houston, Inc.*, 668 S.W.2d 509, 512–13 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.).

In addition, notwithstanding appellees' assertions that Trailways laid behind the log concerning its denial of liability for its subsidiaries' torts, the relationship between Trailways as the parent and TBS as the subsidiary which sold the tickets to the decedents was known to appellees as early as October 16, 1981, when Roland Rose, president of TBS and Trailways Texas and a vice-president of Trailways, gave deposition testimony indicating the relationship between Trailways and its subsidiaries. This should have put appellees on notice that they may have sued the wrong corporation. *See Lucas v. Texas Indus., Inc.*, 696 S.W.2d 372, 376 (Tex.1984). Nevertheless, appellees made no attempt to join the subsidiaries or amend their pleadings before trial to reflect the parent/subsidiary relationship.

■ Even if alter ego or derivative liability had become an issue in the case at the time of trial, however, there was no evidence to hold Trailways liable for the actions of its subsidiaries. Generally, a court will not disregard the corporate fiction and hold a corporation liable for the obligations of its subsidiary except where it appears the corporate entity of the subsidiary is being used as a sham to perpetrate a fraud, to avoid liability, to avoid the effect of a statute, or in other exceptional circumstances when the corporate form has been used as part of a basically unfair device to achieve an inequitable result. *See Castleberry v. Branscum*, 721 S.W.2d 270, 271 (Tex.1986); *Lucas*, 696 S.W.2d at 374–75; *Torregrossa v. Szelc*, 603 S.W.2d 803, 804 (Tex.1980). Specifically, we disregard the corporate fiction when, among other reasons, a corporation is organized and operated as a mere tool or business conduit of another corporation. *Castleberry*, 721 S.W.2d at 272.

■ However, there must be something more than mere unity of financial interest, ownership and control for a court to treat the subsidiary as the alter ego of the parent and make the parent liable for the subsidiary's actions. *Lucas*, 696 S.W.2d at 374. Merely showing a blending of activities between the parent and subsidiary,

such that they may have had some or all of the same directors or officers, filed consolidated income tax returns, shared the same corporate logo, conducted inter-corporate business, or officed in the same building, is not alone sufficient to make the parent liable. *See Lucas,* 696 S.W.2d at 376; *3–D Elec. Co. v. Barnett Constr. Co.,* 706 S.W.2d 135, 139–40 (Tex.App.—Dallas 1986, writ ref'd n.r.e.); *Mortgage and Trust, Inc. v. Bonner & Co.,* 572 S.W.2d 344, 350 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.).

■ In the present case, the only evidence offered to connect TBS or Trailways Texas to Trailways was the deposition testimony of Rose that TBS and Trailways Texas are wholly-owned subsidiaries of Trailways, that TBS, Trailways Texas, and Trailways all have their principal places of business in the same office building in Dallas, Texas, and that the majority of the directors of the corporations are the same. This was not sufficient to show that the parent/subsidiary relationship had been used as part of a basically unfair device to achieve an inequitable result, or that the subsidiaries were organized and operated as mere tools or business conduits of the parent.

Finally, appellees point to certain documents filed as exhibits to their post-verdict Motion for Judgment which suggest that Texas Trailways had dissolved, TBS had its authority to do business in Texas withdrawn, and that under the circumstances Trailways assumed the liability of its subsidiaries. However, these matters are not a part of the evidence and were not before the court or jury at the time of trial. Had they believed that these documents were material and would have probably produced a different result at trial, appellees should have sought a new trial on the ground of newly discovered evidence. *See Jackson v. Van Winkle,* 660 S.W.2d 807, 809 (Tex.1983).

In conclusion, we hold that there was no evidence, pleadings or findings to support

disregarding the corporate separateness of Trailways from its wholly-owned subsidiaries and that judgment should not have been rendered against Trailways based entirely on the extension of liability to the subsidiaries. Appellant Trailways' first point of error is sustained.

By its second through fifth points of error, Trailways complains that the trial court erred in entering judgment against it based on the court's directed verdict that Trailways was acting as an agent for the undisclosed principal TDN.[1] Specifically, Trailways complains by its third point of error that the trial court erred in refusing to submit to the jury the question of disclosure, since substantial fact issues were raised by the evidence on the issue of disclosure.

■ In order to hold Trailways liable for the negligence of TDN, the trial court made its own findings before the case went to the jury, that Trailways both acted as agent for the undisclosed principal TDN and breached its implied contractual duty of safe passage to the decedents. When reviewing a directed verdict, we must determine whether any evidence of probative force raises fact issues on the material questions presented. *Qantel Business Sys., Inc. v. Custom Controls Co.,* 761 S.W.2d 302, 304 (Tex.1988); *Saenz v. Starry,* 774 S.W.2d 730, 731 (Tex.App.—Corpus Christi 1989, writ denied). We view the evidence in the light most favorable to the party against whom the verdict was rendered and disregard all contrary evidence and inferences. *Qantel,* 761 S.W.2d at 303; *Saenz,* 774 S.W.2d at 731.

■ In Texas, public transportation companies are not insurers of the safety of their passengers. *City of Dallas v. Jackson,* 450 S.W.2d 62 (Tex.1970). Nevertheless, several courts have suggested that an implied contractual duty to carry passengers safely does arise and that this duty extends to portions of the journey made on a separate bus line when the initial carrier

---

1. For simplicity of discussion, we will refer to the actions of Trailways' subsidiaries as those of "Trailways" in our discussion of this point.

fails to disclose to its passengers that a portion of their journey will be made on the other line, thus acting as agent for an undisclosed principal. *See Garza v. Greyhound Lines, Inc.,* 418 S.W.2d 595, 598 (Tex.Civ.App.—San Antonio 1967, no writ); *Hudson v. Continental Bus Sys., Inc.,* 317 S.W.2d 584, 588 (Tex.Civ.App.—Texarkana 1958, writ ref'd n.r.e.); *Union Bus Lines v. Young,* 194 S.W.2d 779, 781 (Tex.Civ.App.—Waco 1946, no writ); *see generally Ramirez v. Autobuses Blancos Flecha Roja, S.A. de C.V.,* 486 F.2d 493, 494 (5th Cir. 1973); *Boyles v. McClure,* 243 S.W. 1080 (Tex. Comm'n App.1922, judgm't adopted). Thus, in the present case, Trailways can be held liable for TDN's negligent operation of the bus in Mexico as a breach of Trailways' duty of safe carriage only if Trailways was acting as agent for the undisclosed principal TDN in the original sale of the bus tickets.

■ One who acts as agent for another in making a contract is individually liable thereon as agent for an undisclosed principal if, at the time of making the contract, he fails to disclose his agency and the identity of his principal. If the agent would avoid personal liability, the duty is on him to disclose his principal; the duty is not upon the party with whom the agent deals to discover the principal. *Hideca Petroleum Corp. v. Tampimex Oil Int'l Ltd.,* 740 S.W.2d 838, 842 (Tex.App.—Houston [1st Dist.] 1987, no writ); *Dodds v. Charles Jourdan Boutique, Inc.,* 648 S.W.2d 763, 766 (Tex.App.—Corpus Christi 1983, no writ); *Anderson v. Smith,* 398 S.W.2d 635, 637 (Tex.Civ.App.—Dallas 1965, no writ).

In the present case, at its Corpus Christi station, Trailways sold to the decedents, bus tickets conspicuously labelled "Continental Trailways." The tickets indicated Corpus Christi as the departure point and Mexico City as the destination. In addition, the back of the tickets stated, "the selling carrier acts only as agent and is not responsible beyond its own line." Although the tickets themselves did not mention other specific bus lines, they were redeemable for TDN tickets at the border in accordance with the interlining agreement

with TDN. In the present case, unlike the cases cited above, there was no direct evidence from the parties to the agreement concerning the actual negotiations and representations made by the agent at the time the contract was formed which would show the agent's disclosure or nondisclosure of his representative capacity. *Cf. Dodds,* 648 S.W.2d at 766; *Hideca,* 740 S.W.2d at 844; *Medical Personnel Pool of Dallas, Inc. v. Seale,* 554 S.W.2d 211, 215 (Tex.Civ.App.—Dallas 1977, writ ref'd n.r.e.). The only evidence offered from which the jury might determine that Trailways did not at the time of sale disclose to the decedents the TDN changeover in Brownsville is the testimony from TBS president Roland Rose, who, although he was not present at the time the tickets were sold, speculated that the decedents may not have known that they would ride on a TDN bus unless they specifically asked.

■ A civil litigant who asserts an affirmative claim for relief has the burden to prove every fact essential to his case. *Vance v. My Apartment Steak House of San Antonio, Inc.,* 677 S.W.2d 480, 482 (Tex.1984). In the present case, it is undisputed that Trailways sold the bus tickets in question as agent for its Mexican principal, TDN. Essential to appellees' case is a further showing that Trailways failed to disclose such agency and the name of its principal.

■ The circumstances surrounding the ticket purchase, including Rose's speculation and the fact that the tickets themselves do not disclose the principal, may be sufficient evidence from which the jury could find that Trailways did not disclose its agency. *See Dodds,* 648 S.W.2d at 767. However, it was improper for the trial court to make this finding as a matter of law. Whether Trailways disclosed to the decedents its agency relationship with TDN when it sold the tickets remained a fact issue for the jury to determine. Trailways' third point of error is sustained.

Having sustained Trailways' first and third points of error, we need not address its remaining points.

Finally, we address appellees' four cross-points of error. By their first cross-point, appellees complain that the trial court abused its discretion in refusing to allow them to make a trial amendment expressly placing alter ego in issue.

Texas Rules of Civil Procedure 63 and 66 require the trial court to allow amendment of pleadings unless there is a showing of surprise to another party in maintaining his action or defense. *Greenhalgh v. Service Lloyds Ins. Co.*, 787 S.W.2d 938, 940–41 (1990); *Hardin v. Hardin*, 597 S.W.2d 347, 349 (Tex.1980); *Ohio Medical Prod., Inc. v. Suber*, 758 S.W.2d 870, 872 (Tex.App.—Houston [14th Dist.] 1988, writ denied). However, surprise may be shown on the face of the amendment when it would reshape the cause of action to the prejudice of the opposing party. *Greenhalgh*, 787 S.W.2d at 940–41; *Hardin*, 597 S.W.2d at 349. When the record shows a lack of diligence in bringing the reshaped cause before the court and where the matter pleaded appears to have been known by the party seeking to amend and is not based on any newly discovered facts, the court does not abuse its discretion in refusing to allow the amendment. *See Ohio Medical Prod., Inc.*, 758 S.W.2d at 872; *Sosa v. City of Corpus Christi*, 739 S.W.2d 397, 400 (Tex.App.—Corpus Christi 1987, no writ); *Merit Drilling Co. v. Honish*, 715 S.W.2d 87, 91 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.). In the present case, appellees knew of the relationship between Trailways and its subsidiaries since 1981 and reasonably should have anticipated having to plead and prove alter ego as an element of their case against Trailways. Nevertheless, there was no pleading of alter ego to put Trailways on notice that it would be required to defend the suit on this basis until after the trial and verdict. Therefore, it was not an abuse of discretion for the trial court to refuse to allow the amendment.

In addition, although an amendment to trial pleadings may be allowed after verdict and before judgment in order to conform to the proof established at trial, *see Greenhalgh*, 787 S.W.2d at 940–41; *Am. Produce & Vegetable Co. v. J.D. Campisi's Italian Restaurant*, 533 S.W.2d 380, 386 (Tex.Civ. App.—Tyler 1975, writ ref'd n.r.e.) (on rehearing), because the evidence presented in the present case was legally insufficient to show the relationship of alter ego, the trial court did not abuse its discretion and appellees suffered no harm by failure to allow the present post-verdict trial amendment. Appellees' first cross-point is overruled.

By their second cross-point, appellees complain that the trial court erred in refusing to submit their requested special issues on joint venture between Trailways and TDN based on the interlining agreement. We find, however, that there was no evidence to support this theory and that the trial court correctly directed a verdict in appellants' favor on this issue.

The elements of a joint venture are: (1) a community of interest in the venture; (2) an agreement to share profits; (3) an agreement to share losses, and (4) a mutual right of control or management of the enterprise. *Ayco Dev. Corp. v. G.E.T. Serv. Co.*, 616 S.W.2d 184, 186 (Tex.1981). Although in the present case there may have been an agreement between Trailways and TDN to cooperate in the sale and acceptance of each other's bus tickets and a mutual interest in encouraging travel on the other line, the commission for sales of the other's tickets hardly constitutes an agreement to share profits and losses. In addition, there was no mutual right of control or management of the separate lines as a single enterprise. Instead, each line was wholly responsible for controlling and managing its own buses. Appellees' second cross-point is overruled.

By their third cross-point, appellees complain that the jury's findings that Gilbert V. Mayorga, decedent's husband, suffered only $1.00 in damages in response to each of several inquiries generally regarding past and future care, maintenance and support, loss of companionship, and mental anguish, were against the great weight and preponderance of the evidence.

The amount to be awarded for the losses of a surviving spouse as a result of wrong-

ful death is primarily within the discretion of the jury, based upon their own knowledge, experience and sense of justice. *See Malone & Hyde, Inc. v. Hobrecht,* 685 S.W.2d 739, 746–47 (Tex.App.—San Antonio 1985, writ dism'd by agr.); *Camco, Inc. v. Evans,* 377 S.W.2d 703, 709 (Tex.Civ. App.—San Antonio 1963, writ ref'd n.r.e.). In the present case, we find that the jury acted within its discretion and that the nominal awards to Mr. Mayorga were not against the great weight and preponderance of the evidence. Appellees' third cross-point is overruled.

By their fourth cross-point, appellees complain that the jury's findings that decedents' daughters, Gloria Trevino, Linda Ramirez, Nilda Rangel and Cynthia Cortez suffered no loss of inheritance were against the great weight and preponderance of the evidence.

The daughters' claims for loss of inheritance are legitimate bases for awarding damages as a result of a wrongful death. *Yowell v. Piper Aircraft Corp.,* 703 S.W.2d 630 (Tex.1986). There was evidence offered concerning the earning potential of the decedents and their general tendencies to favor appellees pecuniarily. Nevertheless, inheritance damages depend upon an estimation of the amount that the decedents would have added to their estates and left to appellees at the time of their natural deaths and whether the decedents would have earned more than they would have spent supporting themselves and their families over the years. *See Yowell,* 703 S.W.2d at 633–34. We find in the present case that losses of inheritance based on these calculations were not proven by the great weight and preponderance of the evidence and that it remained within the province of the jury to deny such damages. Appellees' fourth cross-point is overruled.

That portion of the judgment of the trial court holding Trailways jointly and severally liable to appellees for the damages awarded is reversed, and judgment is here rendered that appellees take nothing

against Trailways. The remainder of the judgment is affirmed.